**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| TIMOTHY HENNIGAN, AARON McHENRY, and CHRISTOPHER COCKS, individually and on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| | ) | Action No. 1:11-mc-00656-BAH |
| Plaintiffs, | ) ) | Beryl A. Howell United States District Judge |
| v. | ) ) | |
| GENERAL ELECTRIC COMPANY, | ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO CHUBB SERVICES CORPORATION'S**
**MOTION TO QUASH SUBPOENA OR FOR A PROTECTIVE ORDER**

## TABLE OF CONTENTS

INDEX OF AUTHORITIES AND CONTROLLING OR  MOST
APPROPRIATE AUTHORITIES .................................................................... iii

INTRODUCTION ....................................................................................... 1

STATEMENT OF FACTS ............................................................................ 4

ARGUMENT ............................................................................................ 8

    I.    The Insurance Companies Have Failed To Establish That Compliance
        With The Subpoena Would Cause An Undue Burden ..................................... 8

        A.    The Parties Never Reached An Agreement On The Scope Of The Subpoena ........... 9

        B.    Producing 46 Specific Claim Files Does Not Create An Undue Burden
            For The Insurance Companies And The Court Should Not Adopt Any Of
            The Insurance Companies' Proposed Limitations Of Production ........................... 11

    II.    Consent From 46 Claimants Is Not Necessary And GE Has An Obligation
        As A Party To This Action To Consent To The Disclosure Of The 46 Claimants ......... 13

    III.    Plaintiffs Are Not Required To Bear The Cost Of The Insurance
         Companies' Production .................................................................... 18

CONCLUSION ......................................................................................... 20

# INDEX OF AUTHORITIES AND CONTROLLING OR
# MOST APPROPRIATE AUTHORITIES

**Cases**

*Alexander's Dep't Stores, Inc. v. E. J. Korvette, Inc.*,
  198 F. Supp. 28 (D.C.N.Y. 1961)..................................................................9

*Bank of New York v. Meridien BIAO Bank Tanzania Ltd.*,
  171 F.R.D. 135 (S.D.N.Y. 1997).................................................................17

*Crandall v. City & County of Denver*,
  2007 WL 162743 (D. Colo. Jan. 1, 2007)....................................................19

*Dow Chem. Co. v. Reinhard*,
  2008 WL 1968302 (S.D.N.Y. 2008) ............................................................18

*Dravo Corp. v. Liberty Mut. Ins. Co.*,
  160 F.R.D. 123 (D. Neb. 1995)....................................................................8

* *Flagg v. City of Detroit*,
  252 F.R.D. 346 (E.D.Mich. 2008)...............................................................17

* *Flatow v. Islamic Republic of Iran*,
  201 F.R.D. 5 (D.D.C. 2001).........................................................................8

*Heat & Control, Inc. v. Hester Ind.*,
  785 F2d 1017 (Fed. Cir. 1986).....................................................................8

*In re Honeywell Intern, Inc., Sec. Lit.*,
  230 F.R.D. 293 (S.D.N.Y. 2003)..................................................................18

* *In re Smirman*,
  267 F.R.D. 221 (E.D. Mich. 2010)................................................................8

*In re Subpoena to TD Bank N.A.*,
  2008 WL 5156612 (D. Me. Dec. 1, 2008).....................................................20

* *Linder v. Calero-Portocarrero*,
  180 F.R.D. 168 (D.D.C. 1998).....................................................................18

* *Phillips Petroleum Co. v. Pickens, et al.*,
  105 F.R.D. 545 (N.D. Tex. 1985).................................................................19

*Plant Genetic Sys., N.V. v. Northrup King Co., Inc.*,
  6 F.Supp.2d 859 (E.D. Mo. 1998)...............................................................13

*R.J. Reynolds Tobacco v. Philip Morris, Inc.*,
  29 Fed.Appx. 880 (3rd. Cir. Pa. 2002) ........................................................20

*SEC v. Arthur Young & Co.*,
  584 F.2d 1018 (D.C. Cir. 1978) ...................................................................19

*U.S. v. Columbia Broad. Sys., Inc.*,
  666 F.2d 364 (9th Cir. 1982)........................................................................20

* *U.S. v. Friedman*,
  532 F.2d 928 (3rd Cir. 1976) .......................................................................19

*U.S. v. Int'l Bus. Mach. Corp.*,
    71 F.R.D. 88 (S.D.N.Y. 1976) .................................................................................13

* *United States v. CBS, Inc.*,
    103 F.R.D. 365 (C.D. Cal. 1984) ..............................................................................19

* *Westinghouse Elec. Corp. et al.*,
    351 F.2d 762 (D.C. Cir. 1965) ..................................................................................13

*Wiwa v. Royal Dutch Petroleum Co.*,
    392 F.3d 812 (5th Cir. 2004)......................................................................................8

* *Zubulake v. UBS Warburg LLC*,
    216 F.R.D. 280 (S.D.N.Y. 2003)..............................................................................19

## Statutes

* 17 CFR § 248.15(a)(7) ....................................................................................................16

Mich. Comp. Laws § 500.501(l) ......................................................................................14

Mich. Comp. Laws § 500.507(2)(a) .................................................................................14

Mich. Comp. Laws 500.501(i) ..........................................................................................14

Mich. Comp. Laws 500.539(m) ........................................................................................14

N.M. Stat. Ann. § 59A-12A-14(B)(8) ..............................................................................15

N.M. Stat. Ann. § 59A-12A-2(B) and (C)(3)....................................................................15

## Rules

9A Wright, Miller & Cooper, *Federal Practice & Procedure* § 2459, at 53-55 (2d ed. 1994)................8

* Fed. R. Civ. P. 26(c)(1) ...................................................................................................8

FRCP Rule 45(a)(1)(A)(iii)...............................................................................................17

\* Cases or authorities on which counsel chiefly relies.

Plaintiffs Timothy Hennigan, Aaron McHenry and Christopher Cocks hereby submit this Memorandum Of Points And Authorities in Opposition to the virtually identical Motions to Quash Subpoena or for a Protective Order filed by Chubb Services Corporation ("Chubb Services") in this Court and by Federal Insurance Company ("Federal") in the District Court for the Eastern District of Michigan (Exhibit 1).  Chubb Services and Federal are referred to collectively as the "Insurance Companies."

The Motions to Quash by Chubb Services and Federal are the same in all material respects. Thus, it would be a waste of judicial resources for both District Courts to separately and independently rule on these Motions.  This case was filed in the Eastern District of Michigan over two years ago and that court has already considered and ruled upon numerous discovery disputes, including disputes over the scope of discovery, burden of production, privilege, and confidentiality. These are some of the exact same matters at issue here.  In addition, the Michigan District Court has already set a hearing date on Federal's Motion for February 23, 2012.  Because the Michigan District Court has the greatest understanding of the underlying case and has already ruled on numerous discovery disputes, Plaintiffs believe it would be more efficient for the Michigan District Court to consider and rule on Federal's Motion first, before this Court takes any further action with respect to Chubb Services' Motion.  Accordingly, Plaintiffs request that this Court hold any decision on the instant motion in abeyance until the Michigan District Court has ruled on Federal's Motion.

In the alternative, if this Court chooses to rule upon Chubb Services' Motion before the Michigan District Court rules on Federal's motion, then this Court should deny Chubb Services' Motion for the reasons set forth below.

## INTRODUCTION

Plaintiffs are pursuing a class action complaint against General Electric Company ("GE") because of defectively designed GE-branded microwave ovens ("MWOs") that start by themselves and, as a result, create an unreasonable risk of fire.  (Exhibit 2, Plaintiffs' Third Amended Complaint ("TAC")).  Over the past decade, hundreds of consumers have complained to GE that its MWOs self-start, or turn on by themselves.  In many cases, these self-start failures have led to fires and have been linked to serious personal injuries, including deaths.

For years, GE has claimed to the public—and to various news outlets—that it is not aware of any self-start problem and that its MWOs are completely safe.  Indeed, when Plaintiffs brought this lawsuit, GE represented to the District Court for the Eastern District of Michigan that it had no systematic records of MWO self-starts and that there was no self-start problem with GE-branded MWOs.  However, explosive documents uncovered after two separate court orders rejected GE's attempts to stifle discovery in this case, conclusively established that these denials were false.  Contrary to GE's consistent misrepresentations, GE had known about MWO self-starts for well over a decade and had been systematically tracking MWO self-starts for many years.

Samsung Electronics ("Samsung") is the manufacturer of a large number of GE-branded MWOs.  The Insurance Companies are insurers of Samsung and, through the indemnity agreements between Samsung and GE, the insurers of GE.  (Exhibit 1 at 3).  As Samsung and GE's insurers, the Insurance Companies have a direct and potentially substantial financial interest each time GE distributes a defective and potentially dangerous microwave.

The Insurance Companies have relevant and necessary documents that Plaintiffs have requested through the subpoenas at issue here that have not been obtained from GE.  With respect to the relevant documents, it must be noted that the underwriting and loss control files ("ULC files"), briefly discussed below, have been identified as belonging to Federal and the parties have come to a preliminary

agreement as to the production of these documents.[1]  Although Plaintiffs have already paid for $2,000 in costs associated with the ULC files, the Insurance Companies claim that Plaintiffs should be required to pay more.  At this time, however, the primary dispute pertains to claim files that Chubb Services and Federal have refused to produce.

After months of meet and confer, Plaintiffs drastically limited their discovery requests and offered to pay substantial costs—excluding attorneys' fees—associated with the production.  Claiming that it was concerned about their costs, the Insurance Companies filed two motions the day after Plaintiffs made another proposed compromise.  None of the arguments made by the Insurance Companies have merit.

*First*, there was never any agreement on the scope of the subpoenas.  If there had been an agreement, the Insurance Companies would have produced the documents.  They did not produce the documents because they were insisting on consent from GE and the named claimants and agreement from the Plaintiffs to pay their attorneys' fees.  Plaintiffs never agreed to this, and to the extent that Plaintiffs offered to make certain compromises, they were never accepted by the Insurance Companies.  And, contrary to the assertions of the Insurance Companies, Plaintiffs never assented to the preconditions that they now claim are somehow binding on Plaintiffs.

*Second*, the document production is not unduly burdensome.  The Insurance Companies argue that it would be unduly burdensome to produce both paper and electronic files of 46 claim files.  The Insurance Companies fail to make any effort to meet their burden of proving that such a production would be unduly burdensome.  They claim it would require reassigning employees from other tasks.

---

[1] In a letter dated October 7, 2011 (Exhibit 3 at 1), Plaintiffs agreed to narrow the scope with the respect to the ULC files to the 303 ULC documents Federal identified.  However, without compelling authority, Federal continued to claim that Plaintiffs were required to cover the cost of producing the already identified ULC documents.  It was not until Plaintiffs agreed by email to pay $2,000 (an amount to which Federal is not entitled) and any additional amount ordered by the court (Exhibit 3 at 5) that Federal began the production of the ULC documents on a rolling basis.  And it was not until December 13, 2011 that Plaintiffs began to receive the documents and realized that they were improperly redacted to the point of uselessness.  (Exhibit 4).

For 46 claim files?  It is absolutely remarkable that an insurance company the size of Chubb would claim to this Court, without any factual support, that it would be too difficult to pull less than fifty claim files.  Can an insurance company really function if it cannot pull claim files?  This burden argument makes no sense, and is supported by no factual evidence.

*Third*, there are no laws or other prohibitions on releasing claim files.  For months, the Insurance Companies have held up the production of documents by asserting that ethical or legal prohibitions prevented them from doing so.  And they have made the same claim to the Court.  But the only support for this contention is a handful of state laws that have absolutely no connection to the type of information at issue here.  Those laws govern how an insurance company treats private information belonging to its customers—not information of other parties who have sought compensation from the insurance company.  And the information here is not in any way private or otherwise privileged.  Other than these irrelevant statutes, this argument has no support.

*Finally*, Plaintiffs should not be required to pay the Insurance Companies' attorneys' fees. Plaintiffs have repeatedly offered to pay all actual costs of the production, such as photocopying, shipping, and postage.  But the Insurance Companies (who are insurers of the defendant in this case) are asking the three individual plaintiffs to pay for multiple attorneys (including partners and associates) to review each document.  While there is some authority that can allow cost-sharing under limited circumstances not applicable here, the Insurance Companies have cited no cases requiring a party to pay the cost that a third-party incurs to hire outside attorneys to conduct a privilege review.  Indeed, cases have held that third-parties are not entitled to be compensated for their outside attorneys' fees, even when it is appropriate to order a sharing of costs.

**STATEMENT OF FACTS**

On or about July 20, 2011, Plaintiffs served a subpoena on Chubb Services Corporation and The Chubb Corporation issued out of the District of Columbia.[2]  And on or about August 22, 2011, Plaintiffs served a subpoena on Federal issued out of the Eastern District of Michigan.  Federal holds certain underwriting and loss control files ("ULC files") requested by Plaintiffs, while both Chubb Services and Federal hold certain insurance claim files related to microwave fires or self-starts.  Pursuant to Plaintiffs' subpoenas, responsive documents were originally due August 31, 2011—a deadline which, as a courtesy, has been extended several times by Plaintiffs.

The Insurance Companies' initial response to Plaintiffs, dated August 24th, proposed narrowing the scope of Plaintiffs' request to "open", as opposed to closed claim files, which were purportedly more difficult to access; claims from January 1, 2006 to the present; claims related only to property damage and not bodily injury; and claims that could be identified by electronic search.  Under these severe limitations, the Insurance Companies identified 18 responsive files.  But, the Insurance Companies only offered to produce these files if Plaintiffs bore all costs going forward, yet did not cite any compelling authority as to why Plaintiffs would be responsible to bear these costs.  (Exhibit 3 at 7-9).

In an October 7, 2011 letter, Plaintiffs made a counter-proposal.  Plaintiffs requested that the claim files of 32 MWO owners that Plaintiffs identified from documents previously produced by GE, significantly easing whatever burden the Insurance Companies may have had in identifying relevant claim files.  Under Plaintiffs' proposal, the Insurance Companies did not have to engage in any open-ended searches; instead, they simply had to locate claim files associated with specific incidents already identified.  Plaintiffs even stated that "[a]lthough these 32 claims have already been tendered and the names already disclosed to Chubb," they would, out of an abundance of caution and courtesy, request that GE promptly provide its consent to disclose the names to the Insurance Companies.  (Exhibit 3 at

---

[2]  Based upon representations that The Chubb Corporation did not issue any insurance policies and does not handle any claims against GE, Plaintiffs withdrew their subpoena related to The Chubb Corporation.

1).  The Insurance Companies agreed to produce the 32 claim files, but only if such files complied with

a myriad of limiting, unsupported conditions, including:  explicit consent from each of the 32 claimants

and GE; limited production of "electronic claim notes" instead of the complete contents of the files; and

limited production of claims from January 1, 2003 to present instead of Plaintiffs class scope, which is

January 1, 2000 to present.  (Exhibit 3 at 13).

After the initial request to GE to provide consent for the 32 individuals named in the claim files,

Plaintiffs followed up on October 12, 2011, again asking GE to provide consent.  (*See* Exhibit 9).  After

nearly three weeks, GE claimed—for the first time—that it could not give its consent without reviewing

the names of the individuals whose files were implicated.  Plaintiffs supplied those names on October

24, 2011.  (Exhibit 3 at 19-24).  Instead of giving its consent, GE then erected another barrier on

November 1, 2011, requesting that Plaintiffs identify the documents *produced by GE* that contained

these names.  (Exhibit 3 at 19).  Of course, this very information was readily available to GE.

Nonetheless, that same day Plaintiffs complied with GE's request, providing the Bates number of each

document from which the names were derived.  (Exhibit 3 at 25-28).

On November 10, 2011, Plaintiffs again sought consent from GE, but received no response or

justification as to why it was not required to give consent.  (Exhibit 3 at 29).  Finally, on December 2nd,

Plaintiffs requested consent a final time or an explanation for a refusal.  (Exhibit 3 at 30).  After the

Insurance Companies filed these motions, GE finally responded to Plaintiffs, stating that its consent was

now "moot."  (Exhibit 3 at 34).

In letters dated October 7, 2011 (Exhibit 3 at 1-3) and October 24, 2011 (Exhibit 3 at 35-36),

Plaintiffs provided detailed legal authority justifying their position that they were not required to pay

any costs associated with complying with the subpoenas, and did not evince acceptance of the Insurance

Companies' other restrictions.  On October 26th, the Insurance Companies responded that they would

continue to unduly delay the discovery process until Plaintiffs agreed to their outrageous "cost-sharing"

proposal and also included an unfounded assumption that "it appears the parties have now reached agreement on the scope of production for the claim file documents." (Exhibit 3 at 37-39).

As Plaintiffs were in the midst of depositions and constant correspondence with GE in a fruitless attempt to gain consent for the release of the 32 claimant names, it was not until November 16, 2011 that Plaintiffs were able to fully respond to the Insurance Companies, making clear that they nowhere assented—explicitly or impliedly—to any of the Insurance Companies' proposed scope limitations. Plaintiffs also made clear that the requested claim files concerned claims and claimant information *already held* by the Insurance Companies, making GE's consent to transmission of the names unnecessary. (Exhibit 3 at 42). Plaintiffs, therefore, provided a list of the 32 claimant names to and also requested that they produce an additional 14 claim files relating to microwave fires or self-starts that Plaintiffs identified from documents received from State Farm Insurance through subpoena (Exhibit 3 at 42, 45-51); a subpoena that, incidentally, was nearly identical to the subpoenas at issue here (Exhibit 5), yet State Farm Insurance had no difficulty responding and producing relevant documents.[3] As Plaintiffs significantly limited any burden the Insurance Companies could conceivably face in retrieving these files by providing several pieces of information to make it easy for the Insurance Companies to identify and produce them, the 14 additional claim files created no substantial burden on the Insurance Companies.

Further, in a continuing effort to resolve the ongoing disputes, Plaintiffs agreed that a narrowing the scope to loss dates January 1, 2003 to the present was acceptable since prior dates could not be searched in the Insurance Companies current computer system, and also offered to cover the costs of copying, printing, and mailing the documents. (Exhibit 3 at 42). This reasonable accommodation was not enough for the Insurance Companies.

---

[3] It should also be noted that State Farm Insurance is a truly disinterested non-party, and never demanded that Plaintiffs pay for any of its time or expenses associated with its production.

On November 28th, the Insurance Companies responded, reiterating four of its five proposed conditions (they dropped their refusal to produce bodily-injury claim files). (Exhibit 3 at 54-55). They also stated that the delay was Plaintiffs' fault and that the extensions Plaintiffs allowed in an attempt to further negotiations were their own fault. (Exhibit 3 at 52). The Insurance Companies refused to accept any responsibility for the delay. And despite the fact that the Insurance Companies asked for numerous extensions (all of which were granted by Plaintiffs in good faith), the Insurance Companies hid behind the unsupported claim that they needed GE's consent before producing the documents. They also refused to consider the production of the 14 additional claim files requested by Plaintiffs, rejected Plaintiffs' offer to pay reasonable copying, mailing and printing costs, and demanded that Plaintiffs pay 80% of their costs going forward. (Exhibit 3 at 55-56).

The next day, November 29, 2011, Plaintiffs responded, stating that "[w]hile significant differences remain . . . the potential still exists for an agreement." (Exhibit 3 at 58). Plaintiffs proposed an immediate agreement with respect to the ULC Files, while proposing an extension of one week to work in good faith to resolve the remaining disputes regarding the claim files. (*Id.*) Without responding to Plaintiffs' proposal, the Insurance Companies filed their Motions to Quash the next day.

As stated briefly above, the parties were eventually able to reach an agreement with respect to the ULC files, whereby Plaintiffs paid $2,000 of the cost of production in the hopes that they would receive documents before Plaintiffs' mediation with GE on December 14th and 15th. (Exhibit 3 at 5). Unfortunately, Plaintiffs' $2,000 was not well spent. Plaintiffs received only a few documents on December 13th and December 23rd, and Federal had improperly redacted so much of the documents' content that they are virtually worthless. (Exhibit 4).

## ARGUMENT

**I.      The Insurance Companies Have Failed To Establish That Compliance With The Subpoena Would Cause An Undue Burden**

In order to succeed on a motion to quash, the party moving for relief carries the burden of proving that a subpoena *duces tecum* is unduly burdensome.  *See Flatow v. Islamic Republic of Iran*, 201 F.R.D. 5, 8 (D.D.C. 2001); *In re Smirman*, 267 F.R.D. 221, 223 (E.D. Mich. 2010).[4]  The burden to support a motion to quash as opposed to more limited protection is particularly heavy.  *Heat & Control, Inc. v. Hester Ind.*, 785 F2d 1017, 1025 (Fed. Cir. 1986).  A subpoena will not be quashed simply because the documents sought are voluminous and cumbersome and the production of them proves difficult and expensive.  *See Alexander's Dep't Stores, Inc. v. E. J. Korvette, Inc.*, 198 F. Supp. 28, 29 (D.C.N.Y. 1961).  And even if the party seeking relief can meet the substantial burden of showing the subpoena was unduly burdensome, the court has many alternatives to quashing a subpoena.  Such alternatives include modifying the scope of the subpoena or cost-sharing if the moving party can show that the costs to comply with the subpoena are excessive.  *Dravo Corp. v. Liberty Mut. Ins. Co.*, 160 F.R.D. 123 (D. Neb. 1995).

Here, any burden claimed by the Insurance Companies has been significantly diminished by the fact that Plaintiffs have specifically named 46 claim files, all of which are exceedingly relevant and unable to be obtained from the Defendant GE.  Additionally, due to the exceedingly limited nature of any "burden" placed on the Insurance Companies to produce the 46 claim files requested, the court should not adopt any of the Insurance Companies' limitations on the production of these documents.  Further, the moving party must show that it has "in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action."  Fed. R. Civ. P. 26(c)(1).  Although the parties have been engaged in a meet and confer process for the last three to four months,

---

[4] *See also Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 818 (5th Cir. 2004); 9A Wright, Miller & Cooper, *Federal Practice & Procedure* § 2459, at 53-55 (2d ed. 1994).

the Insurance Companies have failed to deal in good faith during this process; namely by continuing to

mischaracterize the results of the meet and confer process and Plaintiffs' position as to the proposed

conditions of the subpoena, and seeking to enforce an "agreement" that never existed.  Thus, this

Motion to Quash Subpoena Or For Protective Order should be denied.

A.      **The Parties Never Reached An Agreement On The Scope Of The Subpoena**

Plaintiffs requested two forms of documents from the Insurance Companies: (1) underwriting

and loss control documents, and (2) claim files.  These particular documents were requested because

they contain pertinent information with respect to personal injury or property damage claims against GE

that were tendered to the Insurance Companies under the indemnity agreements between GE and

Samsung.  Although some of these claims relate to egregious injuries and damages resulting from fires

caused by GE-branded MWOs, GE has not produced these documents.[5]  Plaintiffs, therefore, correctly

sought access to these documents from their source, the Insurance Companies.

As discussed above, the parties negotiated the terms of the Insurance Companies' compliance

with the subpoena extensively, and the parties reached an agreement relating to the 303 documents

characterized as underwriting and loss control files.  Proof of this agreement can be found in Plaintiffs'

October 7, 2011 letter, where Plaintiffs explicitly state:

> With respect to the underwriting and loss control files, we *accept* your proposal to narrow the
> scope of Chubb's response with the search terms you suggested, and by removing the
> voluminous "loss runs" from any set of potentially responsive documents.

(Exhibit 3 at 1) (emphasis added).  Thus, it is clear that Plaintiffs accepted the scope of the

production of the <u>underwriting</u> and <u>loss control files</u> proposed by the Insurance Companies.  As

to these documents, the parties agreed.  Since that time, Plaintiffs have paid the Insurance

---

[5] Plaintiffs do not know whether GE actually possesses these documents, but it has not produced them.
And third-party discovery is a commonly used method of obtaining documents that a defendant fails to
produce even though it actually possesses the documents.

Companies $2,000, and the Insurance Companies have produced less than 100 pages of documents—all heavily redacted.

The Insurance Companies' proposed limitations to the <u>claim files</u>, set forth in an August 24, 2011 letter, however, were unwarranted and unreasonable, and proposed to limit the scope of the subpoena to: (1) open claim files (based on the fact that these types of files are more convenient for the Insurance Companies to retrieve and not taking into account that closed files have relevant discoverable information entitled to by Plaintiffs); (2) files from January 1, 2006 to the present (even though our class encompasses MWO ovens manufactured back to 2000 and GE has been requested to produced documents as far back as 2000); (3) files involving only property damage (which the Insurance Companies later agreed was an unnecessary limitation); and (4) files flagged during excessively limited searches.  (Exhibit 3 at 7-8).  Rather than dealing with these extremely limiting conditions and risking that the Insurance Companies would produce nothing of consequence, Plaintiffs made the following counter proposal:

> With respect to the *hard copy* claim files, we have identified 32 microwave oven fire claimants…[and]…propose that you search for and provide the claims[sic] files for these 32 claimants – *instead of the limitations you have suggested*….

(Exhibit 3 at 1) (emphasis added).  The Insurance Companies responded with a letter dated October 17, 2011 that covered three distinct issues:

- The first section requested a further extension period in which to comply with the subpoena.

- The second section stated that the Insurance Companies would agree to produce the 32 claim files identified by Plaintiffs *if* five additional conditions were met, one of which was – counter to Plaintiffs' proposal with respect to hard copy files – that Plaintiffs must agree to accept only electronic claim files.

- The third section echoed the Insurance Companies' relentless and unpersuasive argument that it was entitled to cost-sharing and would not comply with production until Plaintiffs agreed to cover all costs going forward.

(Exhibit 3 at 11-15) (emphasis added).

On October 24, 2011, Plaintiffs responded.  In response to sections one and three, Plaintiffs agreed to give the Insurance Companies an extension for compliance, and refused, once again, to bear the costs of the Insurance Companies' production.  (Exhibit 3 at 35).  Plaintiffs justifiably did not respond to the unreasonable demands in section two.  The Insurance Companies now demand that since Plaintiffs only addressed sections one and three when they responded on October 24, 2011, Plaintiffs somehow agreed to the conditions set out by the Insurance Companies in section two of its October 17th letter, and thereby created an agreement that should be enforced by this Court.  (Exhibit 3 at 38).

As the language in the communications between the parties clearly shows, no agreement as to the scope of the claim files was ever made, and the Insurance Companies' insistence that there was agreement between the parties in this regard shows a bad faith attempt to restrict Plaintiffs' access to documents to which they are entitled.

**B.      Producing 46 Specific Claim Files Does Not Create An Undue Burden For The Insurance Companies And The Court Should Not Adopt Any Of The Insurance Companies' Proposed Limitations Of Production**

Plaintiffs seek limited, discrete documents that are highly relevant to this case and that the Insurance Companies could easily produce.  The Insurance Companies' arguments to the contrary are simply part of an effort to delay and hinder the progress of this case.  In an effort to streamline the discovery process, Plaintiffs offered the Insurance Companies the names of 46 consumers whose claims had been tendered to the Insurance Companies due to a self-start or fire occurrence with a GE-branded MWO.  The Insurance Companies argue that the production of the documents sought by Plaintiffs is overly broad and unduly burdensome because: (1) the production of the hard copy claim files is unnecessary and unreasonably duplicative; (2) any production may include privileged and confidential information that may need to be reviewed and redacted; (3)  the production of 46 claim files is unduly burdensome; and (4) each claimant and GE must provide explicit consent prior to production of each

claim file or all identifiable information must be redacted.  (Exhibit 1 at 11).  These arguments are unavailing.

First, despite Plaintiffs' request, the Insurance Companies have given no indication of what differing information is found in the electronic files it has agreed to produce as opposed to the hard copy files it has not.  Plaintiffs have only been told that the files are "generally" the same.  Yet, even in their briefs, the Insurance Companies make no assertion that the information in the electronic claim files and hard copy claim files are substantially the same.  If the hard copy files contain relevant information not included in the electronic files, then the Insurance Companies are required to produce this information.  And it is the Insurance Companies' burden to show that the hard copy files are unduly burdensome to produce, which it has unsuccessfully attempted to do.  Additionally, no company is too big to engage in discovery, and the Insurance Companies' alleged failure to maintain their documents in a reasonable manner cannot serve as an excuse to avoid the production of important evidence or to push the costs of production onto Plaintiffs.

The Insurance Companies claim that there is a "significant burden associated with producing closed Chubb Services claims files" because there may be hard copies that are stored at off-site locations that would need to be copied, shipped, and returned to storage.  However, the 46 files requested by Plaintiffs should have been maintained in the Insurance Companies' usual course of business, and, as a multi-national corporation that is regularly subjected to litigation and subpoenas, it should have maintained its files in a central, accessible location should it have to produce them.  In short, Plaintiffs should not be held responsible for the Insurance Companies' failure to maintain readily accessible files.

Moreover, the fact that the Insurance Companies are nonparties does not diminish its responsibility to produce relevant material.  This case involves important public safety issues that threaten injuries, the loss of life, and millions of dollars in consumer property damage.  Courts have

found that the importance of the case and the ability of a party to obtain information factor highly in what constitutes a burden on a nonparty.[6]

At issue here are less than 15,000 *pages* of documents from already identified claim files that are known to contain pertinent information directly related to damages caused by GE-branded MWOs.  In a product liability action of such size and importance, this request for documents could not be more precise and easily obtainable.  Accordingly, the Insurance Companies' assertion that producing these documents would be unduly burdensome lacks merit.

**II.      Consent From 46 Claimants Is Not Necessary And GE Has An Obligation As A Party To This Action To Consent To The Disclosure Of The 46 Claimants**

Plaintiffs are under no legal obligation to gain consent from either GE or the 46 claimants – who are not policyholders of the Insurance Companies – in order to obtain the requested claim files.  It was only as a professional courtesy that Plaintiffs sought consent from GE, who unreasonably withheld its consent in order to obstruct discovery.  And on November 28, 2011, the Insurance Companies, for the first time, attempted to provide support for its assertion that consent from the 46 claimants, whose files were requested by Plaintiffs, was necessary in order for the Insurance Companies to release the documents.  (Exhibit 3 at 53).  Their attempt was baseless.  The Insurance Companies cherry-picked random statutes from five states, which, when read in context, provide no support for the Insurance Companies' argument.  Additionally, the Insurance Companies have never explained why they chose

---

[6] *See Westinghouse Elec. Corp. et al.*, 351 F.2d 762, 767 (D.C. Cir. 1965) (stating that cases, such as treble-damage anti-trust cases, are important and involve large sums of money, and that these facts are "relevant in determining the reasonableness of the subpoena."  Even though the subpoena is addressed to a non-party, inconvenience occasioned by compliance with the subpoena is not a sufficient reason to quash"); *U.S. v. Int'l Bus. Mach. Corp.*, 71 F.R.D. 88 (S.D.N.Y. 1976) (finding contention by nonparty, who was served with subpoena *duces tecum* by defendant in pending antitrust action, that compliance with subpoena would require three to six months and costs tens of thousands of dollars, was unpersuasive and did not require quashing of subpoena in light of size and significance of pending antitrust litigation); *Plant Genetic Sys., N.V. v. Northrup King Co., Inc.*, 6 F.Supp.2d 859 (E.D. Mo. 1998) (finding in a patent infringement suit where plaintiffs sought information from a nonparty that pertained to the central issue of claim, and where plaintiff was unable to obtain information elsewhere, the subpoena *duces tecum* was relevant, necessary, and not unduly burdensome).

these five states, and have not shown that any of the 46 claim files sought by Plaintiffs came from these five states.

The Insurance Companies' November 28, 2011 letter cited the following statutes, none of which support its position:

- "Mich. Comp. Laws § 500.525, 500.529 (providing that an insurer may not disclosure[sic] personal financial information to a third party without providing notice of the proposed disclosure and a reasonable opportunity to object to the disclosure)"

Contrary to the Insurance Companies' suggestion, they are not the insurers of these 46 claimants. These 46 claimants either have their own insurance providers or simply reported a claim to GE, which was handled by GE's insurance provider, Electric Insurance, and then tendered to the Insurance Companies for handling. The Insurance Companies in this case are licensees, or "licensed insurer or producer, and other persons licensed or required to be licensed, authorized or required to be authorized,…to hold a certificate under this act." Mich. Comp. Laws § 500.501(l). Under Section 500.507, "a licensee is not required to provide an initial notice to a consumer under subsection (1) if the licensee…does not disclose any nonpublic personal financial information about that consumer to any nonaffiliated third party, other than as authorized by sections 537 and 539, and the licensee does not have a customer relationship with the consumer." Mich. Comp. Laws § 500.507(2)(a). The Insurance Companies do not have a customer relationship with these 46 claimants, which is defined as a "continuing relationship between a consumer and a licensee under which the licensee provides 1 or more insurance products or services…." Mich. Comp. Laws 500.501(i). Additionally, Section 539 authorizes the disclosure of nonpublic personal financial information "to comply with a properly authorized civil, criminal, or regulatory investigation, subpoena, or summons by a federal, state, or local authority." Mich. Comp. Laws 500.539(m).

- "Fla. Stat. § 624.23 (stating that health or personal financial information relating to insurance is confidential and may not be disclosed)"

This section is an exception to Florida's Insurance Code pertaining to public records, and is entirely irrelevant to the Insurance Companies' files. Further the cited section merely gives the definitions of "consumer" and "personal financial and health information," and goes on to say that "personal financial and health information" *held by the Department of Financial Services or the Office of Insurance Regulation* is confidential and exempt from certain provisions.  Nowhere in this section does it say that health and financial information *maintained by a private insurance company* may not be disclosed.  In fact, even if it did, Plaintiffs are not seeking the type of information referenced in the public records exemption.

- "N.M. Stat. Ann. § 59A-12A-14 ('An administrator shall not disclose records containing personal information that may be associated with an identifiable individual covered by a plan or insurance carrier…')"

First, the Insurance Companies are not administrators under this statute, since an administrator is defined as "a person who receives any form of administrative or service fee…for performing or providing any service…including but not limited to claims…or other agreement to be performed in this state…'administrator' does not include:  an insurance company or a corporation which owns more than fifty percent of an insurance company…."  N.M. Stat. Ann. § 59A-12A-2(B) and (C)(3).  Second, even if the Insurance Companies could be considered administrators, the statute states that Subsection A of Section 59A-12A-14 (partially quoted by Chubb) "does not apply to information disclosed for any of the following reasons…(8) as required by law."  N.M. Stat. Ann. § 59A-12A-14(B)(8).  Since this exception would encompass compliance with a subpoena, this section is irrelevant.

- "N.D. Cent. Code § 26.1-02-27 ('An insurance company, nonprofit health service corporation, or health maintenance organization may not disclose to a nonaffiliated third party a customer's nonpublic personal information…')"

The Insurance Companies has selectively quoted this statute in a very misleading manner.  The rest of this quotation reads "…contrary to the provisions of title V of the Gramm-Leach-Bliley Act…or contrary to the rules adopted by the commissioner under this section."  Further, the section continues:

15

"a. [t]he commissioner shall adopt rules necessary to carry out this section. [and] b. [t]he rules must be consistent with and not more restrictive than the … 'Privacy of Consumer Financial and Health Information Regulation.'  This regulation, 17 CFR § 248.15(a)(7), is promulgated under section 504 of the Gramm-Leach-Bliley Act (an Act created, in part, to protect nonpublic information by requiring financial institutions to have policies in place to protect the information from foreseeable threats in security and data integrity) by the Securities Exchange Commission and states that the requirements for notice and to opt out do not apply when disclosing nonpublic personal information "(i) [t]o comply with federal, State, or local laws, rules and other applicable legal requirements; (ii) [t]o comply with a properly authorized civil, criminal, or regulatory investigation, or subpoena or summons by federal, State, or local authorities; or (iii) [t]o respond to judicial process or government regulatory authorities having jurisdiction over you for examination, compliance, or other purposes as authorized by law."  The Insurance Companies never address the complex web of federal and state regulations cross-referenced here – likely because to do so would not support the Insurance Companies' position that they should be exempt from a reasonable subpoena seeking highly relevant documents.

- "36 Okl. St. § 307.2 (Pursuant to the Insurance Code, "[n]o person shall disclose any nonpublic personal information…")"

Once again, the Insurance Companies' selective quotation is misleading as the rest of this quotation reads "…contrary to the provisions of Title V of the Gramm-Leach-Bliley Act of 1999."  As above, section 504 of the Gramm-Leach-Bliley Act states that the requirements for notice and to opt out do not apply when disclosing nonpublic personal information "(i) [t]o comply with federal, State, or local laws, rules and other applicable legal requirements; (ii) [t]o comply with a properly authorized civil, criminal, or regulatory investigation, or subpoena or summons by federal, State, or local authorities; or (iii) [t]o respond to judicial process or government regulatory authorities having

jurisdiction over you for examination, compliance, or other purposes as authorized by law." Thus, this Oklahoma statute is irrelevant for the same reasons as North Dakota's law, above.

As these statutes relied on by the Insurance Companies show, states generally allow for the disclosure of nonpublic personal financial information pursuant to subpoena, and notice to the original claimants is not necessary. Moreover, the kind of nonpublic personal financial information that these statutes purport to protect is not the information Plaintiffs seek. Redaction of nonpublic personally identifiable financial information is a viable, though unnecessary, option.

Additionally, the Insurance Companies have provided no authority to support its contention that *GE* must consent to the disclosure of the identity of these 46 claimants. Plaintiffs know that the identities of these claimants are already in the Insurance Companies' possession. Indeed, giving the Insurance Companies the names was a way to diminish any burden the Insurance Companies had with respect to their compliance with the subpoena. Instead, the Insurance Companies and GE have used this good-faith gesture as a way to keep from Plaintiffs all of the documents to which they are legally entitled. Both GE and the Insurance Companies have continued to insist that GE's consent is necessary for the disclosure of the identity of the 46 claimants, essentially giving GE control of these documents.[7] As GE is obligated under FRCP Rule 45(a)(1)(A)(iii) to produce all documents within its control, GE must consent to the disclosure of these 46 names.

Finally, to the extent that there are any documents that might arguably be sensitive or confidential, the protective order in this case would prevent their public dissemination.

---

[7] *See Flagg v. City of Detroit*, 252 F.R.D. 346, 354 (E.D.Mich. 2008) (stating city had "control" of the communications since the "city could 'block' the disclosure of the text messages by withholding its consent, it could permit the disclosure of those communications by granting its consent"); *Bank of New York v. Meridien BIAO Bank Tanzania Ltd.*, 171 F.R.D. 135, 146 (S.D.N.Y. 1997) (control exists "where a party has 'the practical ability to obtain the documents from a nonparty to the action.'")

### III.    Plaintiffs Are Not Required To Bear The Cost Of The Insurance Companies' Production

It has long been recognized in federal courts that nonparties like the Insurance Companies are required to absorb the costs of complying with a subpoena *duces tecum* as a cost of doing business unless they can demonstrate that this would require the expenditure of an excessive amount of time or money beyond what they should expect to bear as a cost of doing business.  *See U.S. v. Friedman*, 532 F.2d 928, 937-38 (3rd Cir. 1976) (finding that bank must bear costs of responding to a subpoena *duces tecum* as part of the normal cost of doing bank business).  To determine who should bear the costs, federal courts consider three broad factors:  "whether the nonparty actually has an interest in the outcome of the case, whether the nonparty can more readily bear the costs than the requesting party, and whether the litigation is of public importance."  *Linder v. Calero-Portocarrero*, 180 F.R.D. 168, 177 (D.D.C. 1998) (requiring plaintiff to pay for half of the CIA's copying and internal labor costs).

The Insurance Companies have a clear and obvious interest in the outcome of this case.  As Samsung's insurance carriers, the Insurance Companies ultimately cover the losses caused by the manufacture of GE's defective MWOs through the indemnity agreements between GE and Samsung.  Indeed, it has a direct interest in thwarting discovery to prevent Plaintiffs from prevailing in this case— monetary liability to Samsung, which has agreed to indemnify GE.  Under such circumstances, there is no basis upon which to shift the costs to Plaintiffs.[8]

The Insurance Companies, as multi-billion dollar corporations, are clearly more able to bear the costs of complying with a subpoena than Plaintiffs, who are three consumers of limited means.  The total amounts the Insurance Companies claim they will need to spend on production are approximately

---

[8] *See In re Honeywell Intern, Inc., Sec. Lit.*, 230 F.R.D. 293, 303 (S.D.N.Y. 2003) (refusing to award any costs to non-party PriceWaterHouseCoopers (the defendant's auditor) for the cost of producing 63,500 documents generated during an audit of the defendant's files during the class period, because it was not a "classic disinterested non-party"); *Dow Chem. Co. v. Reinhard*, 2008 WL 1968302 at *2 (S.D.N.Y. 2008) (refusing to award all costs to nonparty where it "should have reasonably anticipated being drawn into litigation because of its role" as an auditor in the transaction at issue).

$12,000 with attorney's fees and approximately $400 without.  These values are *de minimis* in and of themselves for companies of this size, especially in light of amounts that federal courts consider "excessive" in cases of great public importance, such as Plaintiffs action against GE.[9]   During the meet and confer process, the Insurance Companies insisted that Plaintiffs should pay 80% of its costs and attorneys' fees, but could cite no case that awarded more than fifty percent.  And, as suggested above, $12,000 comes nowhere near the threshold of "excessive" and is a comparatively meager amount, especially to parties interested in the outcome of this case.

It is also alarming that the Insurance Companies believe it is reasonable to demand Plaintiffs pay their attorneys' fees, the most significant portion of its production costs.  The Insurance Companies unilaterally chose to retain a law firm to assist it with responding to Plaintiffs' subpoena.  That law firm also claims it must have associate attorneys *and* partners review all of the responsive claim files. (Exhibit 3 at 16).  Plaintiffs should not be forced to subsidize this excessive arrangement.  Indeed, courts that have addressed this issue have held that although the sharing of costs may be appropriate, a third party is not entitled to recover its attorneys' fees.[10]

Further, cost is clearly not a significant factor for the Insurance Companies, considering that the parties were still in negotiations when the Insurance Companies decided to file these motions, even after

---

[9] *Cf. Dow Chem. Co. v. Reinhard*, 2008 WL 1968302 at *2 (S.D.N.Y. Apr. 29, 2008) (apportioning part of $360,000 third party discovery costs to requesting party); *Crandall v. City & County of Denver*, 2007 WL 162743 at *1 (D. Colo. Jan. 1, 2007) (requiring demanding party to pay $29,078.40 of $164,905.70 in expenses sought by third party); *U.S. v. Columbia Broad. Sys., Inc.*, 666 F.2d 364 (9th Cir. 1982) ($2.3 million excessive in a case of great public importance); *SEC v. Arthur Young & Co.*, 584 F.2d 1018 (D.C. Cir. 1978) ($100,000 excessive in a case of great public importance).

[10] *See Phillips Petroleum Co. v. Pickens, et al.*, 105 F.R.D. 545, 551 (N.D. Tex. 1985) ("There is no authority in the federal rules for reimbursing a third party witness for his attorneys' fees."); *United States v. CBS, Inc.,* 103 F.R.D. 365, 374 (C.D. Cal. 1984) ("The Nonparty Witnesses will not be allowed to recover the costs incurred in retaining outside counsel."); *Zubulake v. UBS Warburg LLC*, 216 F.R.D. 280, 290 (S.D.N.Y. 2003) (refusing to allocate the costs of reviewing documents to the requesting party where the "producing party has the ability to control the cost of reviewing the documents," "unilaterally decides on the review protocol," and could just as easily obtained a paralegal, and not a senior associate, to review the documents).

receiving an offer from Plaintiffs' to cover $1,000 of its costs.  Instead, the Insurance Companies decided to bear the costs of litigating this matter in the courts of two different districts, while rejecting Plaintiffs' reasonable offer to pay nearly 10% of the Insurance Companies' excessive estimated costs, despite the clear rule that these costs are the Insurance Companies' responsibility.

Finally, even if Plaintiffs were required to pay some portion of the Insurance Companies costs— beyond the $2,000 that they have already paid—the Insurance Companies have not met their burden of proving what those expenses are and whether they were reasonably incurred.[11]

## **CONCLUSION**

This Court should hold any ruling on this Motion in abeyance until the District Court for the Eastern District of Michigan has had an opportunity to rule on Federal's virtually identical motion.  In the alternative, for the foregoing reasons, the Motion To Quash Subpoena Or For Protective Order should be denied.

---

[11] *See In re Subpoena to TD Bank N.A.*, 2008 WL 5156612 at *6 (D. Me. Dec. 1, 2008) (where billings of nonparty's counsel were not reasonably necessary and expense incurred by nonparty was out of proportion to "what should have been necessary to facilitate its compliance with the subpoenas," shifting fees to requesting party was inappropriate); *R.J. Reynolds Tobacco v. Philip Morris, Inc.*, 29 Fed.Appx. 880, 882 (3rd. Cir. Pa. 2002) (stating that lower court abused its discretion when it did not consider evidence of the expenses of the nonparty before deciding on fees and costs).  Thus, Plaintiffs should not be required to bear the costs of the Insurance Companies' production.

Respectfully submitted,

/s/ Hassan A. Zavareei
Hassan A. Zavareei
TYCKO & ZAVAREEI LLP
2000 L Street, N.W., Suite 808
2000 L Street, N.W., Suite 808
Washington, D.C.  20036
(202) 973-0900
(202) 973-0950 (*facsimile*)
hzavareei@tzlegal.com

Ann L. Miller
THE MILLER LAW FIRM, P.C.
The Miller Building
950 West University Drive, Suite 300
Rochester, MI  48307
(248) 841-2200
(248) 652-2852 *facsimile*
epm@millerlawpc.com

*Attorneys for Plaintiffs Timothy Hennigan, Aaron McHenry, and Christopher Cocks*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this day, PLAINTIFFS' MEMORANDUM OF

POINTS AND AUTHORITIES IN OPPOSITION TO CHUBB SERVICES CORPORATION'S

MOTION TO QUASH SUBPOENA OR FOR A PROTECTIVE ORDER was filed and served via

electronic mail delivery upon all ECF recipients.


Dated:  December 30, 2011

/s/ Hassan A. Zavareei
Hassan A. Zavareei (D.C. Bar No. 456161)
TYCKO & ZAVAREEI, LLP
2000 L Street, N.W., Suite 808
Washington, D.C.  20036
(202) 973-0900
(202) 973-0950 *facsimile*
hzavareei@tzlegal.com

*Attorneys for Plaintiffs Timothy Hennigan, Aaron
McHenry, and Christopher Cocks*